**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**TINA LOUISE GREEN,**

      **Plaintiff,**

**vs.**                             **CIVIL ACTION NO. 1:16-CV-08977**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

      This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered September 20, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Summary Judgment/Judgment on the Pleadings. (Document Nos. 17 and 21.)

      Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

judgment on the pleadings (Document No. 17.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 21.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Tina Louise Green (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on September 28, 2012 alleging disability as of July 31, 2012 due to "osteoarthritis, neuropathy, type 2 diabetes, depression, and anxiety". (Tr. at 204.) Her claim was initially denied on May 3, 2013 (Tr. at 98-108.) and again upon reconsideration on October 10, 2013. (Tr. at 114-120.) Thereafter, Claimant filed a written request for hearing on November 7, 2013. (Tr. at 121-122.) An administrative hearing was held on January 9, 2015 before the Honorable Benjamin McMillion, Administrative Law Judge ("ALJ"). (Tr. at 34-63.) On April 9, 2015, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 14-33.) On May 28, 2015, Claimant sought review by the Appeals Council of the ALJ's decision as well as additional time to submit a written argument in support of her claim. (Tr. at 11-12.) The Appeals Council granted Claimant's request for additional time (Tr. at 7-8.), and Claimant submitted her brief on July 28, 2015. (Tr. at 9, 303-307.)

The ALJ's decision became the final decision of the Commissioner on July 20, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On September 19, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 12 and 13.) Subsequently, Claimant filed a Motion for Summary Judgment and Memorandum in support thereof (Document

Nos. 17 and 18.), and in response, the Commissioner filed a Brief in Support of Defendant's

Decision. (Document No. 21.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 43 years old when the ALJ determined she was not disabled; she would be

defined as a "younger person" by the Regulations as of her alleged onset date and throughout these

proceedings to the date last insured ("DLI"). See 20 C.F.R. § 404.1563(c). (Tr. at 19.) Claimant

obtained her GED in 1992. (Tr. at 37, 205.) During the fifteen years prior to her alleged onset date,

Claimant primarily worked at the United States Postal Service, at full time for about five years,

and subsequently on an "as needed" basis as a postmaster's relief. (Tr. at 37.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has

the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).

A disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable impairment which can be expected to last for a continuous period of

not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of

disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further

inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a

claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant

is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c).

If a severe impairment is present, the third inquiry is whether such impairment meets or equals any

of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id.

§ 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

4

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 19, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since July 31, 2012, the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: osteoarthritis; neuropathy; diabetes type 2; depression; and anxiety. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 20, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work as defined in the Regulations

6

except the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant can stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. The claimant can occasionally climb ramps and stairs and balance, stoop, kneel, crouch and crawl. The claimant cannot climb ladders, ropes or scaffolds. The claimant must avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors, dusts, gasses and poor ventilation and avoid moderate exposure to hazards. Finally, the claimant can perform one to two step job instructions. (Tr. at 22, Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing her past relevant work. (Tr. at 26, Finding No. 6.) At the fifth and final step, the ALJ found that Claimant was 40 years old on the alleged onset date, making her a younger individual (Id., Finding No. 7.); that she had at least a high school education and able to communicate in English; that the transferability of job skills was immaterial to the determination of disability because the Medical-Vocational Rules support a finding of "not disabled" and that based on her age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Claimant can perform. (Tr. at 27, Finding Nos. 8-10.) The ALJ determined that Claimant had not been under a disability from July 31, 2012 through the date of the decision. (Tr. at 28, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

First, Claimant argues that the ALJ parsed through the record to find evidence that supported his findings that her impairments were less significant than they were, an example being that the ALJ considered an X-ray, but not an MRI taken around the same time of her lumbar spine that showed abnormalities. (Document No. 18 at 5-7.)

Second, Claimant asserts that the RFC does not properly take into consideration all her impairments and limitations that were supported by her testimony as well as her treating physician's findings. (Id. at 7-9.) In light of the RFC assessment, the ALJ mischaracterized

Claimant's testimony in support of his findings that her activities of daily living were not indicative of disability, because the evidence actually demonstrated her capabilities were significantly circumscribed, and that she was incapable of engaging in substantial gainful activity. (Id. at 10-12.)

Third, Claimant contends the ALJ improperly discounted her treating physician's opinion and impermissibly relied upon the opinions provided by non-examining State agency consultants. (Id. at 12.) Claimant states that the ALJ took issue with her treating physician's opinion being over two years old, but gave greater value to the nearly equal dated opinions by the State agency consultants; further, the ALJ neither appreciated the fact that Claimant's treating physician's opinion corroborated the hearing testimony, nor that he had been treating Claimant since she was a teenager. (Id. at 12-13.)

Fourth, Claimant argues the jobs identified by the ALJ neither appropriately corresponded to her abilities, nor to the hypothetical question posed to the vocational expert; in particular, the jobs listed do not correspond to Claimant's inability to stand or sit for long periods, to repeatedly use her upper extremities, or to follow more than a two-step job instruction. (Id. at 14-15.)

Fifth, the ALJ's emphasis on Claimant's part-time work did not support his conclusions; this work demonstrated that she attempted to work as much as she could, she testified that she had much assistance during that time, and that she was incapable of full time work. (Id. at 15-16.)

Finally, Claimant contends that the ALJ improperly considered the limitations caused by her psychological impairments, which illustrated she had greater difficulties in social functioning, in concentration and recent memory, as well as in a work setting. (Id. at 17-18.)

For all these errors, Claimant asks the Court to vacate the decision and order that she be

granted benefits, or in the alternative, to remand this matter in order for the Commissioner to correct the errors below. (Id. at 18.)

In response, the Commissioner asserts that the ALJ reviewed all the evidence of record, including the September 2014 MRI that was submitted post-hearing, which did not reveal any significant changes in Claimant's spine from previous imagining. (Document No. 21 at 4-5.) Further, the ALJ referenced a treatment note from October 2014 that referenced the September 2014 MRI results that revealed Claimant's physical condition was unremarkable; other evidence pertaining to Claimant's spine since the September 2014 MRI underscored her unremarkable condition, therefore, the ALJ's failure to specifically address the September 2014 MRI does not warrant remand. (Id. at 5-6.) Additionally, the Commissioner argues that Claimant failed to demonstrate any harm from this omission. (Id. at 6.)

Next, the Commissioner contends that Claimant's argument that the ALJ's RFC assessment lacks support of the substantial evidence is meritless; each of her credibly established functional limitations were accounted for and the ALJ explained in detail with citations to both the medical and non-medical evidence of record in support of his findings. (Id. at 6-8.)

With regard to the ALJ's evaluation of Claimant's treating physician's opinion, the Commissioner states that the ALJ found the opinion was inconsistent with the evidence of record, including his own patient's testimony, and provided a thorough analysis of why he gave the opinion less weight than the opinions provided by State agency consultants. (Id. at 8-10.) In addition, the ALJ was entitled to rely upon the opinions of the State agency consultants pursuant to the Regulations, and were more recent opinions than that provided by Claimant's treating physician. (Id. at 10-11.)

The jobs identified by the vocational expert comported with the ALJ's RFC assessment, which was supported by the diagnostic findings, physical examination findings, and other evidence of record. (Id. at 11.) Claimant offers no evidence to contradict the vocational expert's testimony that she could perform the jobs of Packer and Inspector; these jobs complied with Claimant's RFC, which was supported by substantial evidence. (Id. at 11-12.)

Moreover, contrary to Claimant's argument that the ALJ disproportionately emphasized her part-time work at the Post Office, he also considered the medical evidence, opinion evidence, Claimant's treatment, as well as her activities of daily living. (Id. at 12.) The Commissioner points out that working while applying for benefits is inconsistent with disability. Roach v. Astrue, No. 08-3770, 2010 WL 1052849, at *5 (D.S.C. March 19, 2010). (Id.)

Lastly, the Commissioner argues that the ALJ properly considered Claimant's mental impairments at each step of the sequential evaluation process, reviewed all the medical evidence and opinion evidence pertinent thereto, and appropriately accounted for same in the RFC assessment. (Id. at 12-13.)

In sum, the Commissioner asserts her final decision is supported by substantial evidence and asks the decision be affirmed. (Id. at 13.)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Treating Physician Harold Cofer, M.D. Medical Records:

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Dr. Cofer's treatment records from October 21, 2011 indicate that Claimant had a follow up appointment regarding her diabetes and a painful left ankle. (Tr. at 373.) It was noted that her low back pain was dull and achy which she rated a 7 on a scale of 10, but it did not radiated into the buttocks, lower extremities, "nor has it radiated cephalad into the interscapular space." (Id.) Claimant reported some improvement in the pain using Lortab, and modest reduction in pain with Tylenol, warm compresses or showers. (Id.) No gait abnormalities were observed and straight leg testing was negative. (Tr. at 374.) Additional treatment records from August 31, 2012 indicated that Claimant complained of low back pain that she rated as a 4 on a scale of 10, "but moderate interfering with her domestic activity." (Tr. at 358.) No weakness in either lower extremity was noted and she showed no gait abnormalities; Claimant could tandem walk and walk on her toes with a slight lift toward the right. (Id.) Straight leg testing was negative and neurologic examination showed intact sensory and motor function, although she had slight numbness at the sole of both feet. (Id.) Claimant reported that her back pain was "very well controlled using current pain management". (Id.)

Due to her continued complaints of back pain, on June 9, 2012 Dr. Cofer ordered an MRI of Claimant's lumbar spine. (Tr. at 310.) The impression was minimal disc disease, L3-4 and L4-5, "similar to prior examination" from February 25, 2011, no evidence for significant central canal or foraminal impingement at any level, and no acute bone marrow edema, fracture or subluxation. (Id.) Treatment notes from February 26, 2014 indicate that Claimant still reported arthralgias/joint pain and back pain, but no muscle aches, weaknesses, cramps, swelling in extremities or difficulties walking. (Tr. at 597.) Claimant denied chest pain, arm pain on exertion or shortness of breath when walking/lying down, numbness, or tingling; she also denied depression, anxiety, panic attacks, sleep disturbances, paranoia, or suicidal ideation. (Id.)

11

Because of the continued pain in Claimant's low back, right hip and knee, on September 1, 2014, Dr. Cofer ordered several x-rays: her lumbar spine showed "no acute lumbar spine abnormality demonstrated" (Tr. at 601.); her right knee showed no significant abnormality (Tr. at 603.); and her right hip and pelvis showed no fractures or dislocation. (Tr. at 604.) An MRI taken on September 29, 2014 of Claimant's right hip indicated very mild degenerative changes. (Tr. at 570-571.) That same date, another lumbar spine MRI revealed a mild disc bulge at L3-L4 with subtle left foraminal protrusion and mild contact upon the bilateral descending L4 nerve roots. (Tr. at 521, 568). At L4-L5, the imagining revealed a broad based disc bulge with superimposed small protrusion and effacement of the bilateral descending L5 nerve roots, but no significant canal stenosis. (Id.)

Dr. Cofer's treatment notes from October 29, 2014 indicate that Claimant "has no complaints at this time" and her home glucometer readings have been more or less on target. (Tr. at 581.) Claimant reported arthralgias/joint pain and upon inspection, scoliosis was present in her lumbar spine, however straight leg raise testing was normal, with normal range of motion and normal strength in her hips. (Tr. at 583.) It was noted that she was neurologically intact; she was oriented to time, place and person, and her mood and affect were normal. (Id.) Claimant was given a prescription for hydrocodone. (Tr. at 584.) By December 3, 2014, Claimant reported that her back pain was improving, and she denied weakness, numbness, and tingling in her extremities. (Tr. at 578.) She reported anxiety, but denied irritability, depression, panic attacks, sleep disturbances, paranoia, or suicidal ideation. (Id.) On examination, her motor strength and tone were normal; she had normal movement in all extremities; she had no muscle tenderness or bony abnormalities; and her extremities showed no signs of cyanosis, edema, varicosities, or palpable

cord. (Tr. at 579.) Claimant's gait and station were normal and she was neurologically intact. (Id.) Claimant returned to Dr. Cofer on January 29, 2015, complaining of dull, achy back pain, which occasionally radiated into the left buttock and left leg, and some weakness in her left lower limb, although she denied experiencing any significant numbness or tingling in either leg. (Tr. at 572.) Dr. Cofer observed Claimant had normal motor strength and tone, but also exhibited tenderness and limited range of motion; she had "significant difficulty walking up on her heels, tip toes, and walking heel-to-toe, often losing her balance and using the walls for assistance." (Tr. at 574.) She also had an irregular gait (Tr. at 575.)

Evidence of Other Physical Impairments:

On January 21, 2011, Claimant was seen by Frederick B. Morgan, D.O. for severe left shoulder pain; on examination, she had full range of motion without exacerbation of her symptoms, her C-spine also had full range of motion. (Tr. at 408.) She did have severe pain over the rotator cuff with palpitation. (Id.) An x-ray confirmed calcific tendonitis of the rotator cuff, for which Dr. Morgan recommended physical therapy and an arthroscopic debridement as last resort. (Tr. at 409.)

On June 6, 2011, Claimant returned to Dr. Morgan regarding right wrist pain and paresthesia in her right hand and left Achilles pain. (Tr. at 410.) He assessed her with mild carpal tunnel, flexor tendonitis right hand, and Achilles tendonitis left side. (Tr. at 411.)[4] Claimant returned to Dr. Morgan on June 14, 2013 for paresthesia right hand which was diagnosed as right carpal tunnel syndrome; she was given a corticosteroid injection. (Tr. at 412.)

---

[4] The undersigned notes that this record may be incomplete: only the first two pages out of three are provided in the transcript. (Tr. at 410-411.)

On March 15, 2013 Claimant presented to Bluestone Health Clinic complaining of lower abdominal pain and vaginal discharge; she reported being concerned about her husband being faithful. (Tr. at 552.) Lab results confirmed chlamydia. (Tr. at 554.) She returned to the clinic on April 17, 2013 for a diabetic checkup, but was upset and crying since separating from her husband who had been cheating on her. (Tr. at 556.) Claimant wanted something for depression, and she was prescribed Celexa. (Tr. at 558.)

Function Report:

With regard to her physical problems, Claimant asserted that she has "a terrible time standing, walking, sitting for any length of time." (Tr. at 226.) Her chronic pain causes her to be depressed and makes her not feeling like doing anything. (Tr. at 228.) Claimant requires help around her house, and in attending her doctor appointments. (Tr. at 229.) She drives "some". (Id.)

She estimated that she could walk 100 feet before needing to stop and rest. (Tr. at 231.) She also estimated that she can pay attention for about 15 to 20 minutes and can "sometimes" follow written instructions, but would require spoken instructions to be "gone over several times." (Id.) Claimant alleged that she is not good at handling stress or changes in routine, and that she feels she is unable to do anything. (Tr. at 232.) She was prescribed a cane and brace that she is supposed to use on a daily basis. (Id.) Her medications cause her dizziness and difficulty in thinking straight. (Tr. at 233.)

DDS Psychological Examiner Opinion Evidence:

On April 22, 2013 Tammie L. Smith, M.A. provided a mental status examination on Claimant. (Tr. at 402-406.) Ms. Smith observed Claimant had normal posture and gait and that she was not using corrective or assistive devices nor normally reported uses such. (Tr. at 402.)

14

Claimant reported her disability "been at least eight or nine years, but I kept on working, but I just couldn't do it." (Tr. at 403.) She reported her primary symptoms from osteoarthritis and diabetic neuropathy are pain, numbness and tingling in her feet, hands, and legs. (Id.) Claimant also reported suffering from insomnia, depression, anxiety and panic attacks; she took medication for depression but it made her groggy. (Id.) She endorsed feelings of worthlessness and having panic attacks on a daily basis. (Tr. at 403-404.)

Claimant reported she attended regular education classes but quit high school in the tenth grade because she got married; she passed the GED on her first attempt. (Tr. at 404.) She had CNA training and had once been licensed as a CNA. (Id.)

The mental status examination indicated that Claimant was polite and cooperative; had relevant and coherent speech; was oriented in all four spheres; a dysphoric mood; a normal affect; her process and thought content and perceptions were normal; her insight good; average judgment; no abnormal psychomotor/behavior; no homicidal/suicidal ideation; immediate memory within normal limits; recent memory was moderately deficient; remote memory was mildly deficient; concentration was moderately deficient; persistence was within normal limits; and pace was within normal limits. (Tr. at 405.) Ms. Smith diagnosed Claimant with depressive disorder, not otherwise specified and anxiety disorder, not otherwise specified. (Tr. at 406.) These diagnoses were based upon Claimant's self-report; Ms. Smith was uncertain what role her medical problems play in exacerbating Claimant's moods, or in her reported symptoms of anxiety and panic attacks. (Id.) She gave Claimant a fair to good prognosis with psychiatric follow up recommended. (Id.)

Treating Physician Opinion Evidence:

On November 16, 2012, Dr. Harold Cofer completed a "Physical Capacities Evaluation" form. (Tr. at 344-347.) He had diagnosed Claimant with chronic lumbar strain, and osteoarthrosis, left ankle, with fair prognosis. (Tr. at 344.) Dr. Cofer opined that Claimant's symptoms included pain, stiffness and swelling; her left ankle becomes aggravated from standing or walking. (Id.) These symptoms would interfere with Claimant's attention and concentration to perform simple work-related tasks on a frequent basis. (Id.) Dr. Cofer also opined that Claimant's medications had side effects, including constipation and moderate sedation, that would impact her ability to work. (Id.)

In an 8-hour workday, Dr. Cofer estimated that Claimant could sit for 2 hours, stand for 1 hour, and walk for 1 hour, but she would have to make postural adjustments every fifteen minutes. (Id.) Dr. Cofer opined that Claimant had no limitations in repetitive reaching, handling or fingering, and no limitations in using her right foot or both feet for operating foot controls, however, she was unable to use her left foot. (Tr. at 345.) During an 8-hour workday, she could occasionally lift 0-5 pounds only, and occasionally carry up to 10 pounds. (Id.) Dr. Cofer further opined that Claimant could occasionally bend and reach above her shoulder level, but never squat, crawl or climb. (Tr. at 346.) He further opined that Claimant required mild restrictions from unprotected heights and being around moving machinery, but moderate restrictions from exposure to marked changes in temperature and humidity; he found Claimant had no restrictions from driving automotive equipment or from exposure to dust, fumes and gases.[5] (Id.) Finally, Dr. Cofer

---

[5] The undersigned notes that the ALJ interpreted this portion of Dr. Cofer's form opinion to read that Claimant "should never drive automotive equipment or be exposed to dust, fumes or gases". (Tr. at 25.) The form has the heading "**Restrictions of activities involving**: A. Unprotected heights; B. Being around moving machinery; C. Exposure to marked changes in temperature and humidity; D. Driving automotive equipment; E. Exposure to dust, fumes, & gases". (Tr. at 346, emphasis in original.) Next to each of these listed "activities" are spaces for checkmarks, with

opined that Claimant would not require unscheduled work breaks during an 8-hour workday. (Id.)

State Agency Medical Consultants:

On March 1, 2013, at the initial level, Dr. Fulvio Franyutti provided a physical RFC assessment that Claimant could perform light work with the following limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; occasionally climb ramps/stairs/scaffolds; occasionally balance, stoop, kneel, crouch and crawl; avoid concentrated exposure to cold/heat/vibration/fumes/odors/dusts/gases/poor ventilation, etc.; and avoid even moderate exposure to hazards (machinery, heights, etc.). (Tr. at 70-72.) On October 3, 2013, upon reconsideration, Dr. A. Rafael Gomez affirmed Dr. Franyutti's RFC assessment as written (Tr. at 88.); in addition to the other evidence of record, Dr. Gomez also reviewed the November 16, 2012 opinion evidence from Dr. Harold Cofer. (Tr. at 82, 86.)

State Agency Psychological Consultants:

On April 30, 2013, Jeff Harlow, Ph.D. examined the evidence of record and opined that Claimant had no restrictions of activities of daily living, in maintaining social functioning and no repeated episodes of decompensation. (Tr. at 69.) Dr. Harlow found Claimant had moderate difficulties in maintaining concentration, persistence or pace. (Id.) He also assessed Claimant's mental RFC, and concluded that she was moderately limited in her ability to remember locations

---

headings above describing the degree of "restrictions": "None; Mild; Moderate; Total". (Id.) Neither Claimant nor the Commissioner address the ALJ's interpretation of Dr. Cofer's opinion with respect to the degree Claimant's restrictions from driving automotive equipment and exposure to dust, fumes and gases, and this specific issue is not the gravamen of Claimant's appeal, as it appears from his treatment records that Dr. Cofer intended that she has a "total" restriction from these activities, nevertheless, the undersigned felt compelled to mention this peculiarity in the record.

and work-like procedures as well as in her ability to understand and remember detailed instructions, but not significantly limited in her ability to understand and remember very short and simple instructions. (Tr. at 72-73.) Dr. Harlow opined that Claimant had a moderately deficient memory, in her ability to maintain attention and concentration for extended periods, as well as in pace. (Tr. at 73.) Dr. Harlow also found that Claimant was moderately limited in her ability to work with or in proximity to others without being distracted by them. (Id.) Dr. Harlow found the evidence did not support any other mental limitations. (Tr. at 72-74.) Finally, Dr. Harlow opined that "the evidence indicates that the claimant can perform repetitive one and two-step work like activities." (Tr. at 74.)

On September 27, 2013, upon reconsideration, James Bender, M.D. affirmed Dr. Harlow's findings. (Tr. at 84-85, 88-90.)

**The Administrative Hearing**

Claimant Testimony:

Since the alleged onset date of July 31, 2012, Claimant testified that she works as a "PMR", or postmaster's relief, for the United States Postal Service. (Tr. at 37-38.) As a PMR, she works only when the postmaster needed her, however, her duties were the same as when she was postmaster in Pageton, West Virginia. (Id.) Claimant approximated that she started working as a PMR about a year after she resigned as postmaster. (Tr. at 39.) Claimant had to resign as postmaster because of the pain in her legs, feet, and back. (Tr. at 38.) On average, Claimant testified that she works about 15-16 hours per week since 2013. (Id.) Claimant stated that she still worked because she did not want to give up. (Tr. at 52.) She would love to go back to working full time, but cannot. (Tr. at 58-59.)

18

Claimant's duties as a PMR involves unloading packages, sorting mail, setting mail out for carriers, and working at the window. (Tr. at 40.) The heaviest load she had to lift was seventy pounds. (Tr. at 37.) Claimant testified that although the particular post office she works in, Pipestem, is only open four hours a day, she is constantly on her feet. (Id.) She testified that the Pipestem office has only one employee. (Id.) Claimant admitted that she had her daughter, a former postal employee, sometimes helped with the paperwork. (Tr. at 41.) Claimant testified that she turned down other postmaster relief shifts because she cannot bear to work six or eight hour shifts. (Tr. at 43.) She admitted that about 30 times in 2014 she declined to work relief shifts in Pipestem because of the pain in her legs and feet. (Tr. at 43-44.)

Claimant testified that Dr. Cofer has been her family doctor for about 35 years, since she was 14 years old. (Tr. at 44-45.) Although Dr. Cofer had determined that she could sit about two hours during an eight hour workday in November 2012, Claimant testified that now she could sit "at least two hours in the whole eight hours." (Tr. at 45.) Claimant testified that she could stand two hours and walk two hours. (Id.) In order to stay comfortable, she would have to change postures from sitting and walking every thirty minutes. (Tr. at 45-46.)

Claimant testified that she has sciatica that causes her pain in her legs, and some growths on her Achilles that is painful. (Tr. at 46.) She was born with a left club foot which was surgically corrected when she was 2 years old; since her left foot is shorter than her right, she walks with a limp and it had become painful in the last 10-15 years. (Tr. at 47.) She also has heel spurs on both feet. (Id.) Claimant stated that she has diabetic neuropathy that also contributes to her leg and feet pain, but it also affects her hands. (Id.) She has swelling and numbness in the soles of her feet, and will not be aware of injuries to that area. (Tr. at 50.)

19

In addition to neuropathy, Claimant has carpal tunnel syndrome, and it affects her right more severely than her left. (Tr. at 48.) She testified that it causes her to drop things, and though her physician recommended surgery, she did not want to go through with that. (Tr. at 49-50.) Claimant testified that she is in pain constantly, and sleeps in her recliner, but is up and down all night. (Tr. at 51-52.) She also experienced some vertigo, which makes her dizzy and caused her to fall several times. (Tr. at 53.)

Claimant testified that she has help from her daughter, son and husband with cleaning around the house, and only makes small meals, such as grilled cheese sandwiches; she does not cook large holiday meals. (Tr. at 54-55.) Claimant's daughter helps her the most, and she also does the shopping for Claimant; Claimant testified that her daughter is "my savior". (Tr. at 56.) Although the drive to work takes about 20-25 minutes, Claimant said she has to stop each way to take a break. (Tr. at 57.) With personal hygiene, Claimant stated that she is fine, but she has problems bending down to shave her legs and it hurts when she lifts her arms above her head to wash her hair. (Id.) For social activities, Claimant used to go to church more, but since becoming unable to work full time, she just stays home. (Tr. at 58.) Claimant also suffers from depression and takes medication for it, but it does not help much, she stays depressed. (Id.)

Robert Jackson, Vocational Expert ("VE") Testimony:

The VE testified that Claimant's past relevant and current work as a postmaster is described by the DOT as sedentary and skilled, but as she performed it, as heavy exertional level. (Tr. at 59.) Claimant's other past relevant work included a cleaning job that was determined to be light and unskilled. (Tr. at 60.) The ALJ gave a hypothetical of an individual of the same age, education and work history as Claimant and could lift/carry 20 pounds occasionally, 10 pounds frequently, could

stand and/or walk six hours total and sit six hours total; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, poor ventilation; avoid even moderate exposure to hazards; and should receive one- to two-step job instructions. (Tr. at 60-61.) In response to the hypothetical, the VE stated the postmaster job would be unavailable, but other work was, including packer, at the light unskilled level, and inspector grader at the light unskilled level. (Tr. at 61.) If the individual had further restrictions, including occasional handling and fingering and be absent more than two days per month, the VE stated then all competitive employment would be eliminated. (Id.)

Claimant's representative then posed a hypothetical including the limitations identified by Dr. Cofer in Exhibit 4F (Tr. at 344-347.): the individual could sit two hours in an eight-hour workday; stand one hour in an eight-hour workday; walk one hour in an eight-hour workday; may require adjustments every 15 minutes; may lift zero to five pounds occasionally but should not lift six pounds or more ever; may carry 0-10 pounds occasionally; cannot carry 11 pounds or more ever; may occasionally bend, reach above shoulder level; should never squat, crawl, or climb; and is moderately restricted with respect to exposure to marked changes in temperature and humidity. Including those additional restrictions, the VE responded no jobs would remain. (Tr. at 62.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Failure to Address September 29, 2014 MRI of Lumbar Spine:

As stated previously, Claimant argues that the ALJ committed error when he failed to address the MRI results taken of her lumbar spine in September 2014, which revealed abnormalities that x-ray images did not. (Document No. 18 at 5-7.) The ALJ initially found that Claimant's spine impairment did not meet or equal Listing 1.04 due to lack of evidence indicating "nerve root compression, spinal arachnoiditis or psuedocluadication [*sic*]." (Tr. at 20.) In addition, the ALJ considered Claimant's testimony as well as her and her daughter's written statements (Tr. at 257-261, 292-297.) concerning her back, legs, hands, and feet pain. (Tr. at 23.) The ALJ also acknowledged Claimant's allegations of numbness and tingling in her hands interfering with her

22

ability to grip and numbness and swelling in her feet. (Id.) After properly conducting the two-step process to assess Claimant's symptoms with the objective medical evidence,[6] the ALJ found that Claimant's (and her daughter's) statements concerning the intensity, persistence, and limiting effects of Claimant's symptoms were not entirely credible. (Tr. at 22-23.)

Besides noting Claimant's ability "to maintain work on a part-time basis, where she lifts and carries packages", the ALJ considered Claimant's testimony that she "is able to perform household cleaning like sweeping, vacuuming and making beds . . . and is able to prepare meals and do light shopping . . . and is able to drive . . . and enjoys attending church services (Hearing Testimony)." (Tr. at 23.) Though she "was diagnosed with lumbar osteoarthritis (Ex. B6F/17)" (Tr. at 23, 368.), the ALJ recognized that a "[p]rior [MRI] of the claimant's lumbosacral spine dated February 25, 2011, reveal mild L3-4 and L4-5 degenerative disc disease, mild L3-4 and minimal L4-5 disc bulging, but no fracture or disc herniation (Ex. B2F/10)." (Tr. at 23, 319.)

The ALJ then went on to discuss other objective findings: the June 7, 2012 x-ray imaging of Claimant's lumbosacral spine (Tr. at 23, 399.); the June 9, 2012 MRI of Claimant's lumbar spine (Tr. at 23, 310.); the unsuccessful physical therapy she went through for pain relief (Tr. at 23, 368.); the November 30, 2013 radiology report indicating mild scoliosis and L4-5 disc space narrowing (Tr. at 23, 474.); the "September 29, 2014 radiological imaging of Claimant's lumbar spine revealing mild dextroscoliosis convex at L2 and minimal retrolisthesis of L4 on L5 and mild L4-5 disc space narrowing" but also that this "imaging also showed that there was no acute lumbar

---

[6] Craig v. Chater, 76 F.3d 585, 595-596 (4th Cir. 1996).

23

spine abnormality demonstrated (Ex. 21F/1)." (Tr. at 23-24, 601.)[7] Finally, the ALJ referenced the

October 29, 2014 treatment notes that confirm Claimant's scoliosis, negative straight leg-raising

tests, tenderness in her hips, and demonstration of normal range of motion and normal strength.

(Tr. at 24, 583.)[8]

> It was further noted that:
>
> medical records regularly show that the claimant's gait and station were normal . . . medical treatment has been conservative in nature. She has had no surgeries for back or joint pain or urgent emergency room care for acute exacerbation of pain. Moreover, as mentioned earlier, the record reflects work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have been somewhat greater than the claimant has generally reported.

(Tr. at 24.)

An ALJ need not discuss every piece of evidence, because the issue before the Court is

whether the ALJ's decision is supported by substantial evidence, not if he mentioned a particular

piece of evidence. See, e.g., Grubby v. Astrue, 2010 WL 5553677, at *6-7 (W.D.N.C. Nov. 18,

2010); Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005); Young v. Apfel, 221 F.3d 1065 (8th Cir.

2000). In this case, the ALJ noted that the September 2014 imaging showed "no *acute* lumbar spine

abnormality" (emphasis added), not that it demonstrated *no* abnormality. To that extent, the ALJ

did not err by failing to mention the September 29, 2014 MRI of the lumbar spine, particularly when

---

[7] The undersigned notes that the record cited by the ALJ is not dated September 29, 2014, but is actually dated September 1, 2014. Claimant takes issue that the ALJ did not discuss Exhibit B19F, which concerned the MRI of her lumbar spine taken on September 29, 2014. (Tr. at 568-569.); the undersigned further notes that these results were duplicated in Exhibit B14F/27-28. (Tr. at 521-522.) Though neither of these Exhibits (B14F and B19F) were explicitly cited in his written decision, the ALJ included both in the List of Exhibits attached to the decision. (Tr. at 33.)

[8] It is noted that during this treatment session, Dr. Cofer also "[d]iscussed the following results: MRI, lumbar spine – 09/29/14; MRI, hip – 09/29/14; x-ray, lower spine, 4 views – 09/01/14; x-ray, knee, 2 views – 09/01/14; x-ray, hip, 3 view[s] – 09/01/14". (Tr. at 583.)

the evidence is reasonably duplicative, as described *supra*. Accordingly, the undersigned **FINDS** the ALJ's failure to expressly mention the September 2014 lumbar MRI was harmless error, as Claimant has not demonstrated any prejudice from this oversight. Shineski v. Sanders, 556 U.S. 396, 409 (2009).

The RFC Assessment:

Claimant also contends that the ALJ failed to adequately consider her complaints and testimony, particularly with respect to his RFC assessment; in essence, Claimant asserts that her alleged limitations do not support his finding that she is capable of sustained, substantial gainful activity. (Document No. 18 at 7-12.) Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. See Id. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In this particular case, the ALJ noted Claimant reported problems with many job-related functions such as sitting, standing, and walking and that in an eight-hour day, she can sit, stand, and walk for two hours. (Tr. at 23.) Further, the ALJ noted that Claimant had to alternate positions,

and had to do so every 30 minutes while at work. (Id.) It was also noted that Claimant resigned from working full time because of the pain in her legs and back. (Id.) As noted *supra*, the ALJ contrasted these statements with Claimant's testimony as to what she was capable of doing, which included part-time work, household chores, shopping, and attending church. (Id.) Moreover, the ALJ examined the medical evidence of record in order to reconcile Claimant's statements regarding the persistence, intensity and limiting effects of her symptoms with her ongoing ability to maintain a part-time job at the Post Office where she was responsible for lifting and carrying packages, performing some household chores, prepare meals and do light shopping. (Tr. at 22, 23.)

Though Claimant argues that her allegations support greater limitations than those found by the ALJ, however, in order for this Court to do so would necessitate a re-weighing of the conflicting evidence, which is beyond the scope of this judicial review. See Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). In accordance with this Court's duty to scrutinize the record as a whole in order to determine if the Commissioner's conclusions were rational, as noted *supra*, the undersigned **FINDS** that the ALJ's consideration of and resolution of Claimant's limitations and abilities were "rational" and based upon substantial evidence. Oppenheim v. Finch, 495 F.2d at 397.

Evaluating Opinion Evidence:

Claimant next complains that the ALJ improperly discounted her treating physician's opinion and instead favored the opinions of non-examining State agency consultants. (Document No. 18 at 12-13.) Claimant's objection is based upon several grounds: first, that the ALJ's criticism that Dr. Cofer's opinion was over two years old fails to account for the restrictions Dr. Cofer found in his patient's abilities, who he has treated since she was a teenager; second, the ALJ accepted

26

non-examining source opinions that were nearly as dated as Dr. Cofer's opinion; and third, Dr. Cofer's opinion was corroborated by Claimant's testimony as well as the evidence of record.

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is more likely to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2). A treating physician's opinion is afforded "controlling weight" if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Id. The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id.

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)(i)-(ii) and (c)(3)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.[9] Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2).

---

[9] 20 C.F.R. § 404.1527(c)(6) provides:

> When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability program and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Because Dr. Cofer had treated Claimant for a myriad of issues, both physical and mental, his records are replete throughout the ALJ's decision. In turning to the medical evidence, the ALJ found that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." (Tr. at 23.) The ALJ next reviewed the x-ray and other imaging evidence, as discussed *supra*, with many of those reports from Dr. Cofer's treatment recommendations with respect to Claimant's osteoarthritis condition in her lumbar spine. (Tr. at 23-24.) In addition, many of the treatment records concerning Claimant's diabetic neuropathy referenced by the ALJ were also provided by Dr. Cofer. (Tr. at 24.) Specifically, the ALJ noted that treatment records dated October 25, 2013 indicated that Claimant's diabetes "was without complication." (Tr. at 24, 442.) Records dated December 3, 2014 indicated that Claimant's diabetes was uncontrolled, but later records showed her diabetes returned to controlled status. (Tr. at 24, 572, 574, 576, 580, 585.) These records also showed that Claimant "reported no symptoms, including weight gain or loss, no dizziness, sweats, headaches, blurred vision or numbness or calluses on the feet." Further, upon examination, the claimant showed no evidence of edema, cyanosis, varicosities or palpable cord." (Id.)

Dr. Cofer's treatment records also indicated "the claimant's gait and station were normal, her cranial nerves II-XVI were intact, and her motor and sensory functions were normal." (Tr. at 24, 430, 434, 441, 579, 593, 597.) The ALJ recognized that the record showed Claimant was treated conservatively; she had no surgeries for her back or joint pain; no visits to the emergency room for acute exacerbation of pain; and "work activity after the alleged onset date" though not at the level of substantial gainful activity. (Tr. at 24.)

Ultimately, the ALJ determined Dr. Cofer's November 16, 2012 opinion was entitled to

"[l]ittle weight" because "it is not consistent with the record as a whole" and that "[s]pecifically, the claimant testified that she is able to sit, stand and walk for longer periods than assessed by Dr. Cofer." (Tr. at 25, 45.) Another reason given was that "no other records in the medical evidence" provide restrictions as limited as those found by Dr. Cofer. (Tr. at 25.) Lastly, the ALJ noted Dr. Cofer's opinion "was provided over two years ago and does not account for additional developments in the claimant's condition." (Id.)

The opinions provided by State agency medical consultants, Drs. Franyutti and Gomez, were afforded "[g]reat weight" for being "fully consistent with the record as a whole", particularly with respect to Claimant's osteoarthritis and diabetes with neuropathy; the restrictions found by these two consultants more appropriately accommodated Claimant's physical impairments. (Id.) It is true that the differences in the ages of the aforementioned opinions range from just over three and a half to ten and a half months, and each was submitted many months prior to the closing of the record. It is also true that the ALJ gave the opinions provided by Drs. Franyutti and Gomez more weight than Dr. Cofer's in part because they were "based upon a thorough review of the available records". (Id.)

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d at 1456. From the aforementioned discussion, the ALJ outlined "good reasons" for giving Dr. Cofer's opinion less than controlling weight as mandated by the Regulations. He identified Dr. Cofer as Claimant's treating physician. (Tr. at 25.) The ALJ did not specifically reference Dr. Cofer's specialty or the nature and extent of his treatment relationship with Claimant, although those factors are not in dispute: Claimant testified that he had been her family doctor for several years, and the ALJ

referenced several medical records from Dr. Cofer that spanned from January 21, 2011 through January 29, 2015 that included treatment for her osteoarthritis condition, diabetic neuropathy, depression, and anxiety. (Tr. at 23-24.) As stated *supra*, the Regulations provide "various other factors" to take into account when an ALJ decides to give a treating physician's opinion less than controlling weight:

> the amount of understanding of our disability program and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding; and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

The ALJ expressly noted that Drs. Franyutti and Gomez are non-treating and non-examining medical sources, however, their opinions were based upon their thorough review of all the available records. (Tr. at 25.) In contrast, though Claimant's treating physician, there is no indication that Dr. Cofer reviewed all the <u>other</u> records of evidence, but would have relied upon his <u>own</u>. Moreover, the ALJ acknowledged that as State agency medical consultants, their opinions "are based upon a comprehensive understanding of agency rules and regulations." (<u>Id</u>.) Again, there is no indication in the evidence that Dr. Cofer possessed the same understanding of the agency rules and regulations as a State agency medical consultant. Finally, the ALJ found that the State agency opinions were "internally consistent and well supported by a reasonable explanation of the available evidence." (<u>Id</u>.) It is clear that the ALJ acknowledged that although these opinions were of similar age as Dr. Cofer's opinion, the medical consultants had access to all the records available at the time, and as noted above, this included Dr. Cofer's opinion for Dr. Gomez's review of the medical evidence of record when he rendered his opinion.

Therefore, the undersigned **FINDS** that the ALJ's evaluation of Dr. Cofer's opinion

complied with the Regulations, that he provided good reasons for the weight he afforded the opinion, and is supported by substantial evidence.

Jobs Identified in Response to Hypotheticals:

Claimant also argued that the jobs named by the VE, packer and inspector grader, in response to the ALJ's hypothetical, were inadequate with respect to her limitations in both her lower (feet) and upper extremities. (Tr. at 28; Document No. 18 at 14-15.) The hypothetical provided to the VE[10] mirrored the physical RFC findings by State agency medical consultants. (Tr. at 70-72, 86-88.) Both opinions found "unlimited" use of hand/foot controls with the exception of the carrying/lifting restrictions, and both found no manipulative limitations. (Tr. at 71, 87.) Of relevance here, Dr. Cofer found that Claimant was able to use her right foot for repetitive movements for operating foot controls, not her left foot, but was able to use both. (Tr. at 345.) Dr. Cofer also found that Claimant had no limitations in doing repetitive reaching, handling or fingering (Id.), and that she was capable of occasional reaching above her shoulder level. (Tr. at 346.)

The medical record of evidence shows that Claimant underwent nerve conduction studies and an EMG that indicated "evidence of mild bilateral Median neuropathy at the wrist (carpal tunnel syndrome), right more than left." (Tr. at 411.) She was treated with a corticosteroid injection in June 2013 (Tr. at 412.), however, there was no additional evidence that demonstrated significant restrictions to Claimant's hands and wrists. Indeed, with respect to her left shoulder, the record contains no evidence of further treatment since January 21, 2011 (Tr. at 408-409.), and more

---

[10] See page 21 of this Proposed Findings and Recommendation.

importantly, there was no additional evidence that demonstrated significant limitations in her upper extremities that would preclude work as a packer or inspector grader. Moreover, Claimant does not demonstrate any prejudice with respect to these alleged limitations in her RFC assessment. Claimant provides no medical evidence in support of her contention that she could not operate foot pedals as required in the packer position; indeed, the opinions provided by the aforementioned medical sources, including Claimant's own treating physician, support the ALJ's hypothetical, and the resulting jobs named by the VE.

With respect to Claimant's assertion that the packer job requires standing or sitting "for long periods to ensure quality control" (Document No. 18 at 14.), the ALJ posed the question of an individual who can sit/stand/walk for six hours total in an eight-hour workday. (Tr. at 60.) There was no testimony that Claimant was required to sit/stand/walk for six hours straight during an eight-hour workday, and there was no testimony of the specific duties for either of these jobs named by the VE, as neither the ALJ nor Claimant's representative inquired any further into the details of these jobs. Claimant's assertion that an inspector grader job, "if required to record all defects found in the articles the work would clearly require more than the most two-step job instruction process that the hypothetical given to the [VE] contemplated." (Document No. 18 at 14-15.) The undersigned notes that the ALJ's two-step instruction restriction (Tr. at 22, 26.) came from the State agency psychological consultants' mental RFC assessments due to Claimant's memory and concentration related functional deficits. (Tr. at 74, 90.) Unlike the situation with Claimant's physical RFC, Dr. Cofer provided no opinion as to what functional limitations were created by Claimant's mental impairments; indeed, the State agency consultants provided the only mental RFC assessments in the record. Nevertheless, the speculative job requirements were also

not raised at the administrative hearing, and without additional evidence that rebuts the VE's testimony, save a blanket assertion that Claimant cannot perform the work of a packer or inspector grader, Claimant bears "the risk of nonpersuasion". Seacrist v. Weinberger, 538 F.2d 1054, 1057 (4th Cir. 1976). Accordingly, the undersigned **FINDS** the jobs identified by the VE in response to the ALJ's hypothetical question are supported by substantial evidence.

The ALJ's Discussion of Claimant's Part-Time Work:

Claimant next argues that the ALJ disproportionately emphasized her part-time employment as a postmaster's relief to find that she was not disabled, and references her testimony to illustrate that she could barely sustain that level of work. (Document No. 18 at 15-16.) As discussed *supra*, the ALJ did mention Claimant's part-time work in his decision (Tr. at 19, 21, 23, 24.) but he also mentioned Claimant's testimony with regard to her pain and other symptoms, as well as the statements provided by Claimant's daughter. (Tr. at 23) Additionally, the ALJ discussed Claimant's testimony regarding her other activities, such as house cleaning, light shopping, driving, and attending church services. (Id.) However, the gravamen of the ALJ's discussion of the evidence concerned the medical records and medical opinion evidence. (Tr. at 23-26.)

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994). Indeed, "working at a job while applying for benefits [is] inconsistent with complaints of disabling pain." Roach v. Astrue, No. 08-3770, 2010 WL 1052849, at *5 (D.S.C. March 19, 2010) (quoting Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (part-time work)). The ALJ was certainly entitled to discuss the evidence of Claimant's part-time work, and contrary to her assertions otherwise, did not overemphasize that fact, and ultimately concluded that "[b]ased on the entire record, including

33

the testimony of the claimant . . . the evidence fails to support the claimant's assertions of total disability." (Tr. at 26.) Accordingly, the undersigned **FINDS** that this argument lacks merit.

<u>Consideration of Mental Impairments</u>:

Claimant's final argument is that the ALJ improperly considered her mental impairments, depression and anxiety, and their negative impact on her ability to function in a work-like setting, particularly in the area of social functioning; she maintains a fairly solitary lifestyle and not as socially active as the ALJ found. (Document No. 18 at 17-18.)

As an initial matter, the ALJ found that these severe mental impairments did not meet or equal the criteria of Listings 12.04 and 12.06. (Tr. at 20.) With regard to Claimant's social functioning, the ALJ found that she had mild difficulties, but acknowledged Claimant's report that "she does not engage in social activities and that she does not feel comfortable being around others." (Tr. at 21.) However, the ALJ noted Claimant's testimony that she was able to work around others, had no problems getting along with family or friends, and that she had never been fired from past employment for failing to get along with others. (<u>Id</u>.) Moreover, "Drs. Harlow and Binder concluded that the claimant had no limitations with maintaining social functioning." (Tr. at 21, 69, 85.) Nevertheless, the ALJ determined that Claimant had mild restrictions with maintaining social functioning "as such a finding is most consistent with a balance of the record." (Tr. at 21.)

With regard to concentration, persistence or pace, the ALJ determined that Claimant had moderate difficulties, basing this finding on her testimony that she had difficulties with filing reports and needed her daughter's help. (Id.) The ALJ also recognized that Claimant reported difficulty in completing tasks, understanding and following instructions and that she had problems

with her memory and concentration. (Id.) The ALJ also considered Claimant's testimony that she was able to drive herself to work, and prepare meals without limitations. (Id.) Additionally, the ALJ noted that Drs. Harlow and Binder "concluded that the claimant had moderate limitations with maintaining concentration, persistence or pace." (Tr. at 21, 69, 85.) It was further noted that Claimant testified that she had depression and the medication prescribed for it did not help control her symptoms. (Tr. at 23.) However, despite these mental impairments, the ALJ noted that Claimant enjoyed attending church services. (Id.)

Most of the medical evidence pertaining to her mental impairments came from Claimant's treating physician, Dr. Cofer. (Tr. at 24.) It was noted that Claimant was diagnosed with depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified, and that she was prescribed medication and offered a referral to mental health counseling. (Tr. at 24, 426, 575.) Dr. Cofer's records indicated that on December 3, 2014 that Claimant "was not experiencing any symptoms of her mental impairments . . . the claimant appeared to have good judgment . . . normal mood and affect and her recent and remote memory was normal." (Tr. at 24, 578, 579.) By January 2015, the ALJ noted that treatment records showed that Claimant again experienced symptoms of depression and anxiety, and she appeared depressed, "although she was also active, alert and had good insight and judgment." (Tr. at 24, 574.)

The ALJ also considered the April 18, 2013 consultative examination report provided by Tammie Smith, M.A. Notably, Ms. Smith observed Claimant's mood was dysphoric and her recent and remote memory deficient. (Tr. at 25.) The ALJ noted that Ms. Smith's findings revealed that Claimant's mental status examination "was otherwise normal." (Id.) Ms. Smith found Claimant's behavior and attitude appropriate, her thought process and content normal. (Id.) Finally, the ALJ

noted Ms. Smith's examination reported that Claimant's prognosis was fair to good with psychiatric follow up recommended. (Id.) This concluded the ALJ's recitation of the medical evidence regarding Claimant's mental impairments: there was no evidence of inpatient hospitalizations, no emergency room visits, and no specialized outpatient mental health treatment. (Id.) The ALJ found that Claimant "simply takes palliative oral medications for her impairments." (Id.)

The primary opinion evidence of record concerning Claimant's mental impairments comes from Drs. Harlow and Binder, both of whom opined that Claimant had moderate limitations with respect to her concentration, persistence or pace, and due to her symptoms from depression and anxiety, found that Claimant "can sustain work involving one to two step job instructions." (Tr. at 26.) It is also notable that both consultants had Ms. Smith's consultative examination report during their respective reviews of the psychological evidence of record. (Tr. at 65, 81.) The ALJ gave this opinion great weight, finding it consistent with the record as a whole. (Id.) Further, the ALJ credited Drs. Harlow and Binder as medical professionals and experts in disability evaluation as experienced State agency psychological and medical consultants. (Id.)

Interestingly, there is no treating opinion or other opinion evidence in the record finding Claimant disabled, from either her physical or mental impairments; from this standpoint, the ALJ only had her subjective complaints and diagnoses available to determine whether she was disabled, which in and of themselves are not disabling impairments. See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986.) The ALJ concluded that Claimant "does experience some limitations, but only to the extent described in the residual functional capacity[.]" (Tr. at 26.)

Accordingly, the undersigned **FINDS** that the ALJ reasonably and appropriately considered Claimant's mental impairments, including their functional deficits and their impact on Claimant's ability to engage in substantial gainful activity, and ultimately, the final decision by the Commissioner is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Summary Judgment (Document No. 17.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 21.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106

S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 30, 2017.

Omar J. Aboulhosn
United States Magistrate Judge